BALTIMORE-NIGHT BOX
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND PM 3:33
Northern Division

U.S. BANKRUPTCY COURT
DISTRICT OF MARYLAND

William Whittman )
7805 Edmunds Way )
Elkridge, MD 21075 )
samigjoka@yahoo.com )
      Plaintiff )
   Vs )
Penske Automotive Group, Inc. )
2555 S Telegraph Rd, )
Bloomfield Hills, )
MI. 48302 - 0912, USA )
)
The Mercedes Benz Financial Services USA LLC )
P.O. Box 685, )
Roanoke, TX 76262 )
)
PAG Chantilly M1 LLC )
2555 Telegraph Rd., )
Bloomfield Hills MI 48302 )
)
Mercedes-Benz of Chantilly )
14841 Stonecroft Center Ct, )
Chantilly, VA 20151 )
Phone: (703) 952-5615 )
)
Bert O'Neal )
The General Manager of PAG Chantilly M1 LLC )
14841 Stonecroft Center Ct, Chantilly, VA 20151 )
Phone: (703) 952-5615 )
boneal@penskeautomotive.com )
)
United Auto Care, Inc. )
22 GRANDVIEW DR., )
RADFORD, VA, 24141 )
)
Toyota Financial Services )
5005 N River Blvd NE, )
Cedar Rapids, IA 52411 )
Phone 800-255-8713 )
)
TOYOTA MOTOR INSURANCE COMPANY )
5005 N River Blvd NE, )
Cedar Rapids, IA 52411 )

FILED _____ ENTERED
LODGED _____ RECEIVED

DEC 1 0 2021

CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
NIGHT DROP BOX

Case No._____

JURY TRIAL DEAMNDED

U.S. BANKRUPTCY COURT
DISTRICT OF MARYLAND
2021 DEC 10 PM 3:34
BALTIMORE-NIGHT BOX

Phone 800-255-8713 )
                                                        )
Toyota Insurance Management Solutions USA, LLC )
*21061 S. Western Ave., Suite 200* )
*Torrance, CA 90501* )
                                                        )
TOYOTA MOTOR INSURANCE SERVICES, INC. )
6565 Headquarters Dr # W2-5A, )
Plano, TX, 75024, USA )
_____ Defendants _____)

## COMPLAINT

Plaintiff William Whittman, "pro-se" brings this action for relief, in this Federal Court,

based on *Complete Diversity Jurisdiction* for *Bad Faith* Claim, stating as follows:

1. Plaintiff is a resident of the State of MD and *None of the Defendants, is Domiciled*

*in Maryland.*

2. *Bad Faith* is a Recognized Claim upon which relief can be granted, entitling

plaintiff to *Actual, Consequential* and *Punitive Damages.*

3, Plaintiff holds each and every defendants *jointly and severely liable* for the sought

relief,

4. Plaintiff seeks $6,80,000.00, for *Actual and Consequential Damages*, as well and

his pain and or suffering, for all has gone through and still goes through for almost 2 years, and

that he did not have to, had these defendants not acted in bad faith or in the alternative plaintiff

requests whatever amount the jury finds right and just and

5. Plaintiff seeks a) *Punitive Damages* as determined by the jury and b) legal fees, if

legal representation is to be hired, and c) court cost.

6. This Action is within the *Statute of the Limitation and*

7.      *This Bad Faith Claim* is *Tort* and not a *Contract Based* even with the application

of the Va. Law that does not contemplate a bad faith tort claim for what is essentially a breach of

contract action. (*Bettius Sanderson, 839 F.2d at 1016-17*).

## PARTIES

8.      Plaintiff is a Maryland resident and his address is: *7805 Edmunds Way, Elkridge,*

*MD 21075* and none of the Defendants is domiciled in.

9.      *PENSKE (Penske Automotive Group, Inc)* is a *MI and DE Company,* authorized

to transact business in VA *(VA SCC ID No. T0396483)*, and its Principal Office Address is: *2555*

*Telegraph Rd. Bloomfield Hills MI, 48302,* with its registered agent where to serve the process

as:

> CT Corporation System,
> *4701 Cox Rd, Suite 285*
> *Glen Allen VA 23060.*

10.     *Mercedes Financial (Mercedes Benz Financial Services USA LLC* is a, MI

Company, Founded in 2007 but *NOT REGISTERED* with the VA SCC, having such no

recognizable registered agent to be served, and it is for their failure to designate the agent that

plaintiff is forced to serve this defendants at the defendants principal office address, *as*:

> *Mercedes Benz Financial Services USA LLC.,*
> *P.O. Box 685,*
> *Roanoke, TX 76262.*

11.     *PAG (PAG Chantilly M1 LLC)* is a *MI and DE Company,* authorized to transact

business in VA *(VA State Corp. ID No. T0396483)* with its Principal Office Address at: *2555*

*Telegraph Rd. Bloomfield Hills MI, 48302,* and it is registered agent where to serve the process

is:

> CT Corporation System,
> *4701 Cox Rd, Suite 285*
> *Glen Allen VA 23060.*

12.     Chantilly Benz *(Mercedes-Benz of Chantilly,* is *MI and DE Company, (VA SCCC*

*ID No. T039648*3), authorized to transact business in VA, with its Principal Office Address at:

*14841 Stonecroft Center Ct, Chantilly, VA 20151, (Phone: (703) 952-5615)* and it is registered

agent where to serve the process is:

> CT Corporation System,
> *4701 Cox Rd, Suite 285*
> *Glen Allen VA 23060.*

13.     *Bert O'Neal, is* a natural person, the General Manager of the *PAG Chantilly M1*

*LLC.,* and or Chantilly Benz and his known office address to serve the process is:

> Bert O'Neal
> *14841 Stonecroft Center Ct,*
> *Chantilly, VA 20151).*

14.     *UNITED (United Auto Care, Inc., is* an inactive VA Company, (sham company,

in this case) *(See Exhibit 3)*, and its registered agent to recive the service of process is:

> *SEAN JESSIE*
> *22 Grandview Dr.,*
> *Radford, VA, 24141 - 0000.*

15.     *Toyota Financial (Toyota Financial Services,* is an inexistent (inactive) fraudulent

and sham company, not registered to transact any business in Virginia, and the only place to

serve this defendants is its purported address as the address of the company hiding behind this

sham entity that is the address of *TOYOTA MOTOR INSURANCE COMPANY at:*

> *Toyota Financial*
> *5005 N River Blvd NE,*
> *Cedar Rapids, IA 52411.*

16.     *Toyota Motor Insurance (TOYOTA MOTOR INSURANCE COMPANY) is* a

California company, authorized to transact business in Virginia (*VA SCC ID No. F1062522*),

*with its* Principal Office Address at: *5005 N River Blvd NE, Cedar Rapids, IA 52411* and it is

registered agent where to serve the process is:

> CT Corporation System,
> *4701 Cox Rd, Suite 285*
> *Glen Allen VA 23060.*

17.     *Toyota Solutions (Toyota Insurance Management Solutions USA, LLC*, is a

Delaware-domiciled company (*Licensed Insurance Agency*) with its principal place of business

at: *21061 S. Western Ave., Suite 200 Torrance, CA 90501*, authorized to transact its Insurance

Activities in Virginia with *VA SCC ID No; T0701641* and it is registered agent where to serve

the process is:

> CT Corporation System,
> *4701 Cox Rd, Suite 285*
> *Glen Allen VA 23060.*

18.     *Toyota Motor Inc, (TOYOTA MOTOR INSURANCE SERVICES, INC.)* is a

California company, authorized to transact business in Virginia (with VA SCC ID No.

F1136789), with its Principal Office Address at: *6565 Headquarters Dr # W2-5A, Plano, TX,*

*75024, USA* and it is registered agent where to serve the process is:

> CT Corporation System,
> *4701 Cox Rd, Suite 285*
> *Glen Allen VA 23060.*

## JURISDICTION AND VENUE

19.     This Federal Court, has jurisdiction over this action based on *complete diversity*

with none of the defendants domiciled in MD where plaintiff resides and the amount dispute is

well beyond the 75K threshold and

20.     The *venue* is proper based on plaintiff's address in MD.

## LEGAL BASIS

21.     As detailed, in the Statement of Facts, when plaintiff purchased his *Mercedes-Benz Car*, from the Chantilly Benz Location, on June, 14, 2019 for a total sales' price of $37,248.42, all these defendants, (car dealership, financing institution and insurance provider) were, directly or indirectly, involved in selling plaintiff an additional car insurance, called GAP that made the sale of the car more appealing to plaintiff, giving plaintiff a piece of mind that in case he lost his car to theft or accident, he would be completely covered and pay nothing, if his traditional car insurance (Trexes) would not pay off the entire balance on the car loan.

22.     Working in concert with each other and for each other's interest, defendants in this case, engaged in unlawful acts to cheat and deceive plaintiff into a fraudulent Insurance Contract, hiding, behind *sham after sham companies* the real insurance provider, to prevent plaintiff from seeking justice, if plaintiff became eligible for the coverage that could not be denied based on that contract that was itself a product of bad faith.

23.     Therefore, each the defendants, is jointly and severely, liable for the relief sought.

24.     This *bad faith claim* is within the *Statute of Limitation*, with acts giving rise to this cause of action, having come to light on and/or after Jan. 6, 2019, when plaintiff filed his GAP Claim.

25.     The Parties in this Action are residents of different states, but since the acts giving rise to this claim, originated in Virginia, VA State Law, most likely, apply.

26.     Applying the Va. Law, the first issue for this Court to decide is determining if this TORT or CONTRACT based, bad faith claim

27.     Although Va. Law does not contemplate a bad faith tort claim for what is essentially a breach of contract action, (*Bettius Sanderson, 839 F.2d at 1016-17*), the court will find out that this particular bad faith claim is tort and not contract based because bad faith acts of these defendants, lie beyond the scope of the contract and because, *the Contract Itself* , in this case is a product of bad faith.

28.     These Penske defendants' refusals to explain, even to this day, despite plaintiff's numerous written requests to them (*O'Neal & Chantilly Benz & Mercedes Financial & Toyota Financial & PAG and Mercedes Benz Legal Department Representative, Deirdre Thomas, who claimed to be an attorney for Mercedes Benz while an attorney for Toyota Defendants*), how and why they have intentionally misrepresented in the Gap that the Gap Provider, is *United*, which is not and how and why they have misrepresented in this same contract in another paragraph that the Provider is a company called *Program Administrator* which is another falsity, and how and why they have provide in that Contract a phone number to supposedly belong to either United or the Program Administrator, while the number belongs to none of this false and fraudulent, sham enteritis but rather to, yet, another sham false and fraudulent entity called *Toyota Financial*, that is not a known legal entity or a legally known DBA of any legal entity authorized to transact insurance services in VA or anywhere in the country, for this matter, except telling stating that the real provider is Toyota Motors that had been hermetically concealed from plaintiff till that time is deplorable and stupendous beyond belief, making this bad faith tort and not contract based.

29.     Defendants acts here establish a will tort, and the fraudulent contract here is a result of such bad faith willful tort,

30.     Even if this court will conclude that based on Va. Law this bad faith still should be treated as contract based, Virginia Law, still recognizes punitive damages for bad faith, even for breach of contract action if established, that the defendant's acts were a willful tort, as are here, based on *Kamlar, 299 S.E.2d at 518*.

31.     Furthermore, even if this Court is to conclude that based on VA law, this bad faith claim still remains contract based action, the United States Court of Appeals for the Fourth Circuit has held in *Bettius Sanderson, 839 F.2d at 1017*, that still: "*Va. Law, retains the means to punish and deter insurers acting in bad faith to pay judgments in excess of the policy limits when the insurer in bad faith mishandles the disposition of a claim. Id. at 1016, at 1016-17*".

32.     Furthermore, although Virginia Law does not recognize a separate tort for bad faith, because Virginia law punishes and deters insurers from acting in bad faith through legislation, Virginia Law, still recognizes punitive damages for bad faith, even for breach of contract action if established, that the defendant's acts were a willful tort. (*Kamlar, 299 S.E.2d at 518*).

33.     When plaintiff became eligible for the coverage and filed his GAP Claim the GAP Provider(s) refused to pay for the claim, using different bad faith tactics to delay and deny such as irrelevant pretexts and excuses as the driver who stole and crushed plaintiff's car was drunk, or that the other traditional insurance was not paying its part, or that the financing institution had not provided them the pay off, or that they though he was insured at the time of the accident, or that they needed this or that information that was provided to them before, or that they did not know he had filed for a claim, all to delay and deny, in bad faith a valid claim and to give plaintiff the run around, till the time to honor the claim would expire. And requiring from plaintiff the same information and documents, provided to them, over and over again and asking

and purposefully not identifying what exact documents they needed to pay the claim, to delay and deny in bad faith, and furthermore blame plaintiff for their acts of bad faith.

34.     Plaintiff's car was declared a total loss on Dec, 12, 2019 when plaintiff's son Arbin stole his car in the middle of the night and crushed it resulting in a total loss.

35.     Plaintiff notified the police about this act of his son on that same day (around 2 AM, that night) and plaintiff' son was charged and arrested for this and was send directly from the emergency room where he was treated for his wounds, to a mental hospital for kids.

36.     Plaintiff did all he was supposed to do, notify the police his son had no perdition to drive and file his car insurance claim, and his son was arrested and charged.

37.     Plaintiff called that day, Dec 12, 2019, his traditional car insurance "Trexes, and filed the claim with them, believing that Trexes would pay, in good faith its part of the claim, and that GAP would cover whatever reaming car loan balance.

38.     Trexes first denied the claim under the pretext that the driver of the car was drunk, and tried to avoid paying the claim using different dishonest tactics such as demanding from plaintiff even the decree of his divorce, that plaintiff found completely irrelevant, intruding and abusive to force him give up the claim but plaintiff cooperated nonetheless providing them whatever they demanded, not to give them an excuse to deny the claim in bad faith.

39.     While Trexes was refusing to pay the claim, Mercedes Financial was sending plaintiff notices of the outstanding car loan payments.

40.     Plaintiff asked Mercedes Financial, for this reason, on Jan, 6, 2019 to see if they had any leverage to force Trexes pay its part of the claim, since they, (*Penske Defendants*) would end up paying the entire amount owned, based on GAP Insurance, if Trexes did not pay its part.

41.     Mercedes Financial told plaintiff that they, were not the Gap Provider and gave plaintiff the (800) 255-8713) number to reach the GAP Provider.

42.     That day, Jan, 6, 2019, plaintiff called the "GAP Provider" and learned that the provider was, supposedly, a company called Toyota Financial, that is completely false and a fraudulent misrepresentation.

43.     Toyota Financial demanded to record plaintiff, if he wanted to file his GAP Claim and plaintiff agreed, to it, because this requirement was not presented as an option, assuming his claim would be denied, if he did not agree to it.

44.     The Toyota Financial representative Jimmie A. who refused to give her full name, as a company policy, told plaintiff that his claim was 371GMK and at the end of the conversation, told plaintiff that they were denying the claim, just as Trexes had done, because the driver was drunk.

45.     Plaintiff protested this, as irrelevant and then Jamie A. said to plaintiff that if the traditional car insurance denies the claim they do the same.

46.     Plaintiff protested, again saying to Jamie A that they should make their own decision, independent of the other insurance but this was ignored by GAP.

47.     Trexes, did, in fact pay its part of the claim a few weeks later to Mercedes Financial.

48.     On February 11, 2020, Mercedes Financial confirmed Trexes' payment, and told plaintiff, that Trexes had paid or was paying $24,289.29, leaving a balance of $6,568.58 for the Gap Provide to pay, if payment was made by February 13, 2020.

49.     Plaintiff called, that day Toyota Financial to inform GAP Provider that Trexes had paid its part and that the payoff for them, was $6,568.58, if paid by February 13, 2020.

50.     Toyota Financial assured plaintiff, that day, February 13, 2020, that they were going to pay the reaming balance within 5 business days, and that the payment would take place on or before the Fe, 16 of that month and yet.

51.     As of April of 2020 they had not made any payment and plaintiff received a letter from Toyota Financial that was written on or before March 9, 2020. (titled; SECOND NOTIFICATION) demanding from plaintiff some documents, that plaintiff had no clue, what documents they wanted from him. Having not specified what exactly they needed from him and yet

52.     That March 9, 2020 request for some unspecified documents was rendered Moot and irrelevant, because 4 days after that letter appears to have been written, Toyota Financial, had already told plaintiff that they had approved his claim and that they were making the payment to Mercedes Financial, within 5 days but

53.     As of May, 5, 2020 Toyota Financial had failed to pay its share and Mercedes Financial wrote to plaintiff that the reaming balance, remained outstanding.

54.     Plaintiff called Toyota Financial, for this reason, on June 10, 2020 and found out that Toyota Financial had again reversed its decision and denied his claim because the driver was drunk.

55.     When plaintiff demanded to know how that is relevant, Toyota Financial changed the story again and told plaintiff that they had not yet made their decision but they would see what Trexes does first.

56.     When Plaintiff told them that their dishonest tactic made no sense and that they, knew that they were lying because, Trexes had paid its part, since 4 months ago which means he

was insured, they changed the story again, stating that they had denied the claim because Trexes
had denied it first.

57.     When Plaintiff asked them how can you deny the claim if the traditional insurance
denies it but don't pay for the claim if the traditional insurance pays for it, as Trexes had done,
they changed he story again, stating that if the traditional insurance denies or try to deny a claim,
they consider the insured as uninsured.

58.     When Plaintiff demanded, to know how they considered him now that Trexes had
paid its part they changed the story again, that plaintiff had told them, when he first filed the
claim that he had no insurance, in the time of the accident.

59.     When Plaintiff requested they produce the evidence he supposedly had said that,
since they recorded him when he filed the claim, they said we can't because we destroy the
record because we recorded it for training purposes only.

60.     When Plaintiff then told them that he (plaintiff) was going to record them now,
because they were changing their story every single time, Toyota Financial, warned plaintiff that
he cannot do that and changed again their story, telling plaintiff that they had not denied his
claim but needed the payoff information from his financing institution in order to pay the claim,
which, was, yet, another lie and a trick to delay and deny because plaintiff had given them the
payoff information since February 11, when they assured him that they were going to pay their
part, on or before Feb. 16th, 2020.

61.     And yet plaintiff agreed to get the pay off information from Mercedes Financial,
and promptly provide it to them again.

62.     When plaintiff asked them their e-mail address so plaintiff could e-mail them in a
the payoff, they told plaintiff that they are not allowed to provide him with their e-mail, which

was a surprise to plaintiff because e-mail was quicker and safer and traceable, and Trexes, his tradition insurance, in fact preferred e-mail communications.

63.     When Plaintiff asked them how come, in this day and age when everyone communicates via e-mail they refuse this kind of communication, they said: "this is our policy".

64.     When plaintiff asked them why then they do not request the payoff directly from Mercedes Financial, since they work together and Mercedes Financial is the one who sold their product to plaintiff and the one now needed to get paid, they said, "they should contact us and not the other way around, because they want to get paid".

65.     Plaintiff called that day, the Mercedes Financial Loss Recovery Department at 1 - 866- 652- 2523 and explained to them that Toyota Financial was asserting that they had not paid them because they, Mercedes Financial had not send them (Toyota) the payoff information.

66.     Plaintiff asked Mercedes Financial why they who are the one who sold him the GAP Insurance, and who were claiming that the amount to be paid to them by GAP was not paid were not cooperating now with the Gap Provider for the provider to pay them the reaming balance they kept demanding from plaintiff.

67.     Mercedes Financial said to plaintiff that they do not do that, and that all other GAP Providers, they work with, reach out to them and demand from them the payoff information, but Toyota Financial had not done that.

68.     Plaintiff asked, Mercedes Financial, to send him the payoff information via e-mail so plaintiff would print and fax it as instructed to Toyota.

69.     Mercedes Financial e-mailed plaintiff that day, June 10, 2020, the payoff, and the next day, on June 11, plaintiff faxed Toyota Financial, the payoff and yet

Page 13 of 69

70.     As of January 20, 2021, more than half a year since plaintiff provided Toyota with

the payoff information, and more than a year since plaintiff filed the claim, they still had failed

and were refusing, in bad faith, to pay the claim.

71.     On January 20, 2021, plaintiff found out that Mercedes Financial had send his

name for to collection.

72.     This derogatory bad credit, because of the unlawful acts of bad faith of these

defendants has tremendously jeopardized plaintiff's ability to earn his living and care for his

family because plaintiff, is a Licensed Maryland Real Estate Agent and Maryland requires a

credit check on all its agents, before reasoning the license, every 2 years

73.     This consequential harmful act of bad faith has tremendously harmed and injured

plaintiff who because of such harm and injury has suffered tremendous pain and suffering and

financial losses of about $250,000.00 for a home he could not buy at a less than half its value,

because of his ruined credit by acts of these defendants. (*The landlord who no longer wanted to

keep the property plaintiff was renting, offered to sell it to plaintiff, though her real estate agent,

James Spencer, for a price far below the make value, if plaintiff was going to buy it as, before

moving out*).

74.     Plaintiff is a single father of 2 severely depressed children who rely on medical

treatment to get by and plaintiff's older son, is mentally disabled, making it extremely hard for

plaintiff to find a decent home to live, even with good credit, let alone now with his completely

ruined credit because of the acts of bad faith of these defendants.

75.     Plaintiff has searched from lender to lender if he could get a loan to buy that

house, that was a house his children like since it was next to a church and next to a soccer field

and lost him around 200K or more he could have made in this deal, and no lender would be able to provide him with a loan, with that amount of money in collection.

76. Only a few months earlier, before these defendants ruined his credit, by refusing to pay a valid claim and by penalizing him for that, plaintiff had excellent credit and was approved in the spot for a commercial loan that is much harder to get than a residential loan that plaintiff now could no longer get.

77. When Plaintiff informed his landlord's real estate agent that he could not get a loan to buy that house. the landlord notified plaintiff on March 29, 2021, that she was not going to renew the lease, requiring plaintiff to vacate the property by the end of the lease term (*April, 30, 2021*).

78. Searching for a rental home with a ruined credit plaintiff found out that it was more difficult to get approved as a tenant than to qualify to buy in the current real estate market.

79. Being pressed to find a roof for his kids before the landlord would be forced to evict him plaintiff was offering to pay the entire annual rent upfront, costing him away more than people would need to put down for a loan to purchase their home and still he was not getting approved anywhere he looked.

90. Plaintiff was taking painstaking affords to find a home with pain and suffering he had never had experienced to locate a place to live before his credit was ruined and was searching form as far south as Fredericksburg in Va. and Gainesville and Frederick, west up to Baltimore north and Annapolis east and still no one wanted him with ruined credit, in this time with rental demand being too I and supply too limited.

81. And because he could not find a decent place to relocate even with the entire annual rent paid upfront as shown in more details in the statement of the facts, plaintiff was

unable to relocate and the landlord was forced to evict plaintiff worsening plaintiff's already ruined credit and making it even worst for plaintiff to provide for the family means of survival all because acts of bad faith for greet of these defendants.

82.     The allegations in this Complaint (*see the statement of Facts with supporting evidence, incorporated, as parts of the exhibits to be presented during trial, for the jury to determine the facts*), make it clear for this Hon. Court that plaintiff ; 1) has stated his claim for which relief is available, 2) has proved with particular sufficiency that he is entitled for the sought relief, and  3) has given defendant fair notice of the claim and the grounds upon which it rests, (*Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007)*) and 4) has shown that this is not a collection of labels and conclusions, or formulaic recitation of the elements of a cause of action. (*Bell Atl. Corp. v. Twombly* ), rather, the facts here speak for themselves, "res ipsa loquitur"

83.     Even if this Hon. Court will consider this action contract and not tort based, still Va. Law, still Virginia courts, have recognized and made Punitive Damages availble if the breach of contract establishes the elements of an independent, willful tort. *(Kamlar, 299 S.E.2d at 518)*, and punitive damages here are such available, either way.

84.     Insurance companies exist to make money for themselves by providing coverage to their insured, and money they should make, as much as they can, but not by denying valid claims in bad, as they did here.

85.     Insurance companies make money and are designed to be profitable even if they pay all the claims, in good faith.

86.     As much as it is a moral obligation and reasonable duty of ordinary care, the insurance companies are required by law to give equal consideration to the policyholder and not

look only at their interest and profit that can be greater and undeserved when denying a perfectly valid claim, for greed and in bad faith

87.     Plaintiff 's entitlement to consequential damages lies in the fact that the consequential damages that the plaintiff has suffered are foreseeable and specifically identified to have driven from their acts to deny, in bad faith a claim that cannot be denied, except bad faith and furthermore from their act to penalize plaintiff with character injury (ruined credit), for their and not plaintiff's failure to pay the remaining car loan balance, covered by GAP.

88.     Defendants, in this case, have been and are in the driver's seat, and have tremendous financial resources and strength that the plaintiff does not have, and used such disproportion strength and financial means to arbitrarily, and with no legal basis, deny the claim they could not have denied, had they acted in good faith,

89.     Led by their *corporate greed* for about 2 years, defendants have done nothing but give plaintiff the run around, to exhaust and discourage plaintiff from demanding what he is entitled and it is the *Proximate Cause of their Bad Faith & Unfair Business Practices* that*: 1) has made it impossible for plaintiff to provide a decent roof for his kids, even with the entire annual rent paid in full and in advance, & 2) has jeopardized plaintiff's profession and work, that requires good credit, & 3) has lost plaintiff tremendous amount of money, with; (a)  about 250 thousand dollars lost on the house he was renting alone that his landlord offered to him for a huge discount, if he bought it as is, and before moving out and (b) forcing plaintiff to pay, incredible dollar amount, that no one should be forced to pay (the entire annual rent, upfront, in full and in advance for any place desperate not to see his family being evicted and thrown out of their home, because of the unlawful acts of these defendants) and paying for rent, what others, in*

similar circumstances don't even have to pay, as down payment and closing costs combined, to purchase their own home.

90.     Under the common law torts theory, an insurer owes its policyholders a duty of good faith and fair dealing due to the special relationship between the parties.

91.     To prove a *common law claim of bad faith* plaintiff, as the policyholder is required show the court only two elements: (1) that *the benefits due under the policy were withheld,* and (2) that the reason for withholding benefits was unreasonable and plaintiff has shown this with such satisfactory level and degree to survive the challenge of any *12(B)(6) Motion to Dismiss,*

92.     The Courts have long identified that actions, that have occurred here evidence bad faith such as: *a) misrepresenting relevant facts or insurance policy provisions; b) failing to acknowledge a claim and to act promptly after receiving it; c). failing to either approve or deny claims within a reasonable time after the insured has submitted proof of loss; and d) failing to provide a reasonable explanation or reasons for denying the claim.*

93.     As to the legal basis for suing Bert O'Neal, the only issue for the court to resolve is the determination of the corporate veil needs to be pierced before holding Mr. O'Neal liable for his own acts of reckless negligence and failure to exercise his ordinary duty of care toward his customer clients, his company had defrauded and betrayed.

94.     Though Mr. O'Neal might assert he is personally shielded by the Corporate Veil, why acting under the capacity of the company, the Corporate veil does not protect the individuals against their own acts of negligence and recklessness.

95.     Plaintiff has been demanding from Bert O'Neal for more than half a year to explain why his company has fraudulently represented that *United* is plaintiff's insurance

provider, while this is a intentional and deliberate falsity to conceal the identity of the real
provider.

96.     Bert O'Neal has refused and refuses till this day to explain to plaintiff why his
company concealed in the Gap Contract that his company drafted, the real Insurance Provider
and why they have lied with the intent to defraud who the real provider is.

97.     Bert O'Neal has a duty of reasonable care to plaintiff, to explain why they have
defrauded him or at least mistakenly made such false representation

98.     Defendant's O'Neal acts have themselves already pierced the Corporate Veil and
such O'Neal bears the responsibility of his own acts of recklessness and negligence, that are not
protected by any corporate veil, regardless if acting under the capacity of the company or not.


## THE STATEMENT OF FACTS

99.     On June, 14, 2019 plaintiff went to *Chantilly Benz*, in Chantilly Virginia, to buy a
new car.

100.    *Chantilly Benz* is owned by *Chantilly Penske Automotive Group, Inc., (PENSKE)
& PAG Chantilly M1 LLC, Mercedes Benz Financial Services USA LLC "PAG"*

101.    Penske Automotive Group, Inc., according to the Penske Compnay Website,
(www.penskeautomotive.com) is, an international company that operates automotive
dealerships in the United States, and other parts of the world.



102.    The sale's personnel, at *Chantilly Benz* told plaintiff that they provide 100%

financing through their, *Mercedes Financial*, and that they provide an additional car insurance,

called *GAP*.

103.    *GAP*, they explained covers the balance between the Actual Value of the car and

the unpaid car loan amount, if the car is declared a total loss, through theft or accident.

104.    With GAP Insurance, they said, plaintiff would pay nothing if he lost his car to

theft or accident, as explained in the Total Loss Protection Section of the Gap Provider's

Brochure, incorporated bellow.

## Filling the GAP

Your current auto insurance may not be enough if your vehicle is declared a total loss. Often times, the primary auto insurance settlement is based on the market value of the vehicle, which could be less than the balance still owed on your finance or lease contract.

Guaranteed Auto Protection (GAP) waives or pays the balance (minus certain fees and charges) between the amount still owed on your finance or lease contract and your auto insurance settlement.[1]

## Total Loss Protection

If your car is declared a total loss through theft or accidental damage and you still owe more on your finance or lease contract, GAP may reduce or even eliminate your remaining balance.[2]

105.    Plaintiff liked this additional Insurance and this GAP Insurance played a role in plaintiff's decision to buy this car, that day, from *Chantilly Benz.*

106.    Plaintiff purchased that day a 2016 C-Class Mercedes-Benz, for a total sales' price of $37,248.42 and the Gap Insurance, as reflected on *Line 4D* of the "*Retail Installment Sale Contract*".

107.    Mercedes Financial, and Chantilly Benz, who sold plaintiff that day the GAP Insurance, provided plaintiff, that day, with a copy of the *GAP Contract.*

108.    On December 12, 2019, around 2 AM, plaintiff's minor child, Arbin had stolen plaintiff's car and crushed it resulting in a total loss.

109.    Plaintiff informed the police that day that Arbin had stolen his car and Arbin was charged and arrested for that and first send to a mental hospital, as suicidal, after he was treated in the Emergency Room for the wounds he had endured, during the crash/

110.    Plaintiff called that day, December 12, 2019, his tradition car insurance, Trexes, to report the accident and file the claim.

111.    Trexes, first tried to deny the claim, stating that the driver was drunk.

112.    Plaintiff protested their decision to deny on improper basis and Trexes tried to find other excuses to deny the claim, for almost 2 months.

113.    While Trexes was refusing to pay the claim, plaintiff was getting letters from *Mercedes Financial* that the loan was becoming delinquent.

114.    Plaintiff called Mercedes Financial, for this reasons, on Monday, Jan 6, 2020, and asked Mercedes Financial if they had any leverage to force, Trexes pay, the claim they were denying, in bad faith, since Mercedes Financial would end up paying the entire balance if Trexes, did not pay its part, under the GAP Insurance.

115.    The representative for *Mercedes Financial* told plaintiff that they, were not the Gap Provider and gave plaintiff the Gap Provider s phone as 800 255-8713, telling plaintiff to call GAP.

116.    Plaintiff called the 800 number and founded out that his GAP Provider was *Toyota Financial Services,* which turned out to be false and fraudulent.

117.    That day, on 1, 6, 2020 The representative for Toyota Financial told plaintiff that they had to record the conversation, if he wanted to file the claim and asked plaintiff if he was Ok. with it.

118.    Plaintiff agreed to recording, under the impression that it was mandatory, since it was not presented as an option to plaintiff.

119.    The representative's name was Jaimie A. and she refused to give her full name, stating their company does not allow them, to give out their full names.

120.    Jamie A, provided plaintiff with his claim number, as *371GMK*.

121.    After plaintiff explained what had happened and the recording finished Jamie A, told plaintiff, they were denying the claim, because the driver was drunk.

122.    When plaintiff asked how is it relevant, Jamie A said that if the tradition insurance denies the claim they do the same.

123.    Plaintiff protested, telling her that they should make their decision, independent of the other insurance but his argument was ignored and made no difference.

124.    Trexes, however, paid its part of the claim, a month later, on Feb. 2020 but the Gap Provider still did not.

125.    On February 11, 2020, plaintiff called Mercedes Financial and spoke with Cantina Colton to confirm that Trexes had paid its share of the laon,

126.    Cantina Colton told plaintiff, that Trexes had paid or was paying $24,289.29, leaving a balance of $6,568.58 for the Gap Provider, if the payment was made by 2, 13, 2020.

127.    Plaintiff then, called, *Toyota Financial* and spoke, that same day, with Kyle, who just as Jamie A, refused to tell plaintiff her full name.

128.    Plaintiff told Kyle that Trexes had paid its part and that the remaining balance for *Toyota Financial* to pay was $6,568.58, if paid by February 13, 2020.

129.    Kyle told plaintiff, that day, on 2, 13, 2020, that they will pay their share within 5 business days, and that the payment would take place on or before the 16th of that month.

130    On April of 2020 plaintiff received a letter from *Toyota Financial* that was written on March 9, 2020. (titled; SECOND NOTIFICATION).

131.    The text of that letter claims that GAP had reversed the decision to pay the claim because they had allegedly demanded some documents, without specifying what document they

Page 23 of 69

exactly needed to approve the claim that plaintiff was not aware of.



**TOYOTA**
FINANCIAL SERVICES
Customer Service Center - Central
P.O. Box 9550
Cedar Rapids, IA 52409-9550

MARCH 09, 2020

WILLIAM WHITTMAN
3800 POWELL LN UNIT 425
FALLS CHURCH, VA 220413663

Agreement No.:   GAP07725261
Claimant:        WILLIAM WHITTMAN
Date of Loss:    DECEMBER 12, 2019
VIN:             WDDWF4KB3GR143308

RE:   SECOND NOTIFICATION OF INCOMPLETE CLAIM DOCUMENTATION

Dear WILLIAM WHITTMAN:

On JANUARY 07, 2020, Toyota Financial Services (TFS) was notified that you might have a potential Guaranteed Auto Protection (GAP) claim. As of MARCH 09, 2020, we have not received the documentation required by the terms of your GAP agreement to process your claim.

Unfortunately, we cannot process your claim until all of the documentation is received. If the requested documentation is not received within 30 days from the date of this letter, the claim file will be closed. If the documentation is received after your file has been closed, the file will be reopened and processed.

TFS values you as a customer and appreciates this opportunity to review your request. If you have any questions, please contact the TFS GAP Customer Service Department at 800-255-8713 between the hours of 7:00 a.m. and 7:00 p.m. CST, Monday through Friday and 8:00 a.m. and 1:00 p.m. CST, Saturday.

Sincerely,

Toyota Financial Services
Claims Department

132.   *Toyota Financial,* was now demanding some documents that plaintiff does not

know even to this day what specific documents they requested because none of the documents, is

needed to approve the claim has ever been specified, anywhere in the letter or in many phone

calls, despite plaintiff's painstaking efforts to provide to them whatever they need for them to

honor the claim as he has paid for.

133.   *Mercedes Financial* wrote to plaintiff and informed plaintiff that as of May, 5,

2020 the GAP Provider had failed to pay the claim and that the reaming balance, remained

outstanding.

05/05/20

```
2395000043      PRESORT PBP9001 <>
ıllııllıllllıblılııllılllılılılılılllıllılllılılılılllılılılılılılıllı
WILLIAM WHITTMAN
3800 POWELL LN
FALLS CHURCH VA 22041-3687
```

RE:   Account Number:  5001195739001
      Balance:  $6,708.57

Dear Customer(s):

The balance* shown above remains outstanding and owed to Mercedes-Benz Financial Services. This will serve
as our final notice regarding this balance.

We have attempted to resolve this matter amicably and have not reached a resolution on the balance. Please
send the balance in full immediately. If we have not received the balance in full in good funds within 15 days of
the date of this letter, the account will be referred to a collection agency or attorney and will be reported as a
charge off to the credit reporting agencies.

*Please include your account number on your remittance and mail it to:*

**Mercedes-Benz Financial Services**
**PO Box 5209**
**Carol Stream, IL 60197-5209**

*You can also contact us at **(855) 794-4487** for alternate payment options. Please note there is a $15 convenience*
*fee for payments by phone.*

134.   Plaintiff called, for this reason, *Toyota Financial*, on June 10, 2020 and spoke

with a representative who introduced himself as Kevin, refusing to give his full name.

135.   Plaintiff asked Kevin, why they had not paid the claim while Trexes had already

paid its part since 4 months ago and they had promised him they would pay their part by 2, 16,

2020

136.    Kevin said that they had denied his claim because the driver was drunk.

137.    When plaintiff insisted to know why do I care if the driver who stole and crushed
my car was drunk or not, Kevin changed the story and said they had not yet made their final
decision but they would wait and see what Trexes does first, something that made no sense to
plaintiff, since Trexes had already paid its share since 4 months ago and they knew it.

138.    Plaintiff repeated to Kevin that Trexes had already paid its part, and that they
were playing tricks, with him to delay and deny, changing their story, every single time.

139.    Kevin then said that the reason they had denied his claim was because plaintiff
was uninsured at the time of the accident.

140.    This arrogant and arbitrary denial of the fact that plaintiff was insured and they
knew it to be false since Trexes had already paid their part of the claim insulted and made
plaintiff angry to be taken for a fool and to be played like a little kid with cheap and dishonest
tactics that made no sense and that could not have be made, so grossly, by any decent person or
entity and plaintiff asked Kevin to stop this cheap tactics, in bad faith because he (Kevin) himself
had just stated before that they denied his claim because Trexes had denied, his claim first, which
mean, he was insured.

141.    Kevin then said to plaintiff that he was reading some notes and then changed his
story again, stating that they denied the claim because Trexes had denied it first not because he
had no insurance at the time of the accident.

142.    Plaintiff asked Kevin to stop dancing around, and asked Kevin to tell him how if
the Trexes deny his claim made them deny it too but when Trexes paid the claim did not make
them pay>

143.    Kevin than said, to plaintiff that if your car insurance denies your claim we consider you uninsured, that made no sense to plaintiff.

144.    Plaintiff demanded, to know then how they considered him now that Trexes had paid its part of the claim, insured or not insured.

145.    Kevin changed his position again, telling plaintiff that plaintiff had allegedly told them when he filed the claim that he did not have car insurance, at the time of the accident, which was another arbitrary and dishonest lie.

146.    Plaintiff responded angry to Kevin and said to him: *"You, recorded me on January 6, when I filed the claim, so please produce the evidence, based on the recorded evidence, that I have said this because I never did and this is a despicable lie"*.

147.    Kevin then said, we destroy the conversations, because we record you for training purposes only.

148.    Plaintiff then told Kevin that plaintiff was going to record him, since they were changing his story every second.

149.    Kevin warned plaintiff not to record him and changed his position again, telling plaintiff that they had not denied his claim but needed the payoff information from his financing institution before the pay off the claim.

150.    This demand, to plaintiff, was, yet, another dishonest tactic to delay and deny because plaintiff had given them the payoff information since February 11, when he spoke to Kyle, and per Kyle's statements, *Toyota Financial* was to pay the reaming balance since Feb. 16th, and yet;

151.    Plaintiff asked Kevin for their e-mail address so plaintiff could e-mail them the payoff information right away.

152.    Kevin said we don't give out our e-mail address.

153.    Plaintiff was surprised to hear this and he took it for another trick, of theirs to delay and deny, more for the fact that all his communications with his traditional car insurance, Trexes, was done via e-mail.

154.    Plaintiff asked Kevin how come, in this day and age when everyone communicates via e-mail you refuse e-mail communication.

155.    Kevin said: "this is our policy".

156.    Plaintiff then asked Kevin if plaintiff could e-mail the document to Kevin's personal e-mail address so Kevin could download and print and provide them to his company, promptly and quickly.

157.    Kevin said no, it is not allowed, and gave plaintiff their fax number, as **319-221-3064** for plaintiff to fax the payoff information.

158.    Plaintiff asked Kevin why they do not request the payoff directly from Mercedes Financial, then since they do not want to communicate with him via e-mail and more for the fact that *Mercedes Financial* and *Toyota Financial* were in fact working together, as one, here, since it was the *Mercedes Financial* who sold him their GAP Product.

159.    Kevin said that *Mercedes Financial* is the one who needs to get paid and they should contact them and not the other way around.

160.    Plaintiff called that day the *Mercedes Financial Loss Recovery Department* at 1 - 866- 652- 2523 as soon as he hanged up with Kevin and spoke with a *Mercedes Financial* called Desmond.

161.    Plaintiff explained to Desmond that Toyota Financial had not paid them the

balance still owed on the car, because Toyota Financial was claiming, they, *Mercedes Financial*

had not send them the payoff information and

162.    Plaintiff asked Desmond, why they, who sold him the GAP Insurance, and who

were claiming that the amount to be covered by GAP was outstanding, were not sending the

payoff to the Gap Provider.

163.    Desdamon said, that they (*Mercedes Financial*) don't do that, and that all the other

GAP Providers, they work with, reach out to them and demand from them the payoff

information, but Toyota Financial has not done this, in his case.

164.    Plaintiff asked Desdamon, then, to send him (plaintiff) the payoff information, via

e-mail so plaintiff would print and fax it to *Toyota Financial,* as instructed by Kevin.

165.    *Mercedes Financial* e-mailed plaintiff that day, June 10, 2020 the payoff.

**MERCEDES BENZ FINANCIAL**
Terminated Schedule 5001195739/1
Non-regulated first class financing for WILLIAM WHITTMAN
Cash Flow
Currency: USD
Prevailing Lessee PTO: 3.99000%
Rates: Fixed
Downloaded on 6/10/2020 at 4:51 PM by MCDOWEA

| Date | Type | Repayments | Principal repayments | Interest repayments | Unpaid interest | Principal outstanding |
|---|---|---|---|---|---|---|
| 6/14/2019 | Drawdown | -32764.75 | -32764.75 | .00 | .00 | -32764.75 |
| 6/14/2019 | Gap Insurance | -630.00 | -630.00 | .00 | .00 | -33394.75 |
| 7/14/2019 | Payment received | 564.37 | 454.85 | 109.52 | .00 | -32939.90 |
| 8/14/2019 | Payment received | 564.37 | 452.74 | 111.63 | .00 | -32487.16 |
| 9/14/2019 | Payment received | 564.37 | 454.28 | 110.09 | .00 | -32032.88 |
| 10/14/2019 | Payment received | 564.37 | 459.32 | 105.05 | .00 | -31573.56 |
| 11/14/2019 | Payment received | 564.37 | 457.37 | 107.00 | .00 | -31116.19 |
| 12/14/2019 | Payment received | 564.37 | 462.33 | 102.04 | .00 | -30653.86 |
| 3/9/2020 | Reallocation | 24232.85 | 23945.29 | 287.56 | .00 | -6708.57 |
| 3/9/2020 | Remaining balance | 6708.56 | 6708.56 | .00 | .00 | .0 |



166.   Plaintiff downloaded the documents, printed and faxed them, as soon as he got

them, (the next day, on June 11. 2020), to Toyota Financial's fax number as shown bellow.

\*\*\*   TX REPORT   \*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSMISSION OK

TX/RX NO              0229
CONNECTION TEL                      13192213064
CONNECTION ID
ST. TIME             06/11 13:33
USAGE T              04'14
PGS. SENT            4
RESULT               OK





167.    And yet, as of January 20, 2021, more than half a year since plaintiff provided

them with the payoff information, again and more than a year since plaintiff had filed his claim

they still failed and refused to pay this claim, in bad faith.

168.    On January 20, 2021, plaintiff found out that Mercedes Financial had send him to

collection for that unpaid balance.

169.    Plaintiff felt betrayed, by both *Toyota Financial* and *Mercedes Financial*, because

ti was Mercedes Financial who sold plaintiff *Toyota Financial* this *Gap Insurance Product* and

both were doing all they could to make sure the GAP did not end up to pay the claim, but

plaintiff was forced instead to pay it from his own pocket, as if both these companies were in fact

one and the same under different names, bad faith and fraudulent, heinous ordeal

SRA ASSOCIATES OF NEW JERSEY

SRAJ⋯⋯-7495688-00253-253

**PAYSRA.ONLINE**

888-274-2897
Send Correspondence to:
112 W. Park Dr. Suite 200
Mt. Laurel, NJ 08054

January 7, 2021

CREDITOR: Mercedes Benz Financial Services USA LLC
CREDITOR ACCT. # 5001195739001
OUR ACCT. # 00784967
BALANCE DUE: $6,931.51

DEAR WILLIAM WHITTMAN

Your Mercedes Benz Financial Services USA LLC account has been placed with our office for collections. To pay the balance in full, you may visit our website at PAYSRA.ONLINE.

This is a highly unusual time as we all do our best to navigate the constantly changing pandemic situation that has impacted so many people throughout the country. Thus, if you are unable to address the balance owed and would like assistance, please contact us so we can explore options that may be available to you. You may send correspondences to our address listed above.

As noted above, as of the date of this letter, you owe $6,931.51. Because of interest, that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your payment. If an adjustment is made, we may attempt to contact you again about the adjustment.

**IMPORTANT CONSUMER NOTICE**

UNLESS YOU NOTIFY THIS OFFICE WITHIN 30 DAYS AFTER RECEIVING THIS NOTICE THAT YOU DISPUTE THE VALIDITY OF THE DEBT OR ANY PORTION THEREOF. THIS OFFICE WILL ASSUME THE DEBT IS VALID. IF YOU NOTIFY THIS OFFICE IN WRITING WITHIN 30 DAYS AFTER RECEIVING THIS NOTICE THAT YOU DISPUTE THE

170.    This collection for a dept that plaintiff did not own had that they know that

plaintiff does not owe them, harmed and injured plaintiff immensely because plaintiff no longer

is able to provide a roof for his family that plaintiff would have had no problem to provide had

these defendants not ruined his credit with their unlawful acts of fraud and bad faith.

171.    Plaintiff is a single father of 2 severely depressed children and plaintiff's older

son, is mentally disabled, making it not easy for plaintiff to find a decent home to live, even with

good credit, let alone now with the credit ruined because of the acts of bad faith of these

defendants.

172.    Since plaintiff's older son lost his mind, plaintiff has learned how hard it is to

find a place to live in his situation and having his name in collection and a having his credit

ruined did not help the situation.

173. Denying a rental place to a mentally disabled child is a violation of fair housing laws, but refusing to rent based on bad credit is perfectly reasonable for the house providers to deny tenancy that could not have been denied, had these defendants not acted, in bad faith.

174. On the other hand, making things worse for plaintiff, plaintiff's ability to provide for his family was now jeopardized because, plaintiff works as a real estate agent and this has been plaintiff's only profession since 1999 and MD Real Estate Commission requires a credit check on all its agents, before reasoning the lance, every 2 years.

---

LICENSE * REGISTRATION * CERTIFICATION * PERMIT

## STATE OF MARYLAND
## MARYLAND DEPARTMENT OF LABOR

REAL ESTATE COMMISSION
CERTIFIES THAT:
WILLIAM WHITTMAN

PROPLOCATE REALTY
3800 POWELL LN.
SUITE CU-1
FALLS CHURCH          VA 22041

:D: 01 - BROKER

| EXPIRATION | EFFECTIVE | CONTROL NO |
|---|---|---|
| 12-23-2022 | N/A | 5616366 |

---

175. From April of 2020 to April of 2021 plaintiff, was renting a house in Severn MD.

176. Sometime around February of 2021, the landlord's real estate agent, James Spencer contacted plaintiff and told plaintiff that the landlord did not want to hold this house any more, with the house having a lot of problems to be fixed and that if plaintiff was willing to buy it before he moved out and buy it in as is condition she would sell away below the market value, and that with some updates and renovations, would profit plaintiff easily some 2-300 thousand dollars, being in a very desired location., as this home was.

 

177.    Plaintiff had, by that time already learned that *Mercedes Financial* had sent him to collection for the balance that *Toyota Financial* had refused to pay, in bad faith and his credit to buy real estate was now completely diminished.

178.    Plaintiff, asked, however, his loan officer, Time Nguen, who had given plaintiff a few months' earlier, before these defendants ruined plaintiff's credit, a commercial loan, if they Tim's mortgage company, would give him a loan.

179.    Tim informed plaintiff that plaintiff no longer qualifies and that he would not be able to get a loan till the collection has been cleared out and the credit repaired.

180.    Plaintiff informed the landlord's agent that he could not buy the house.

181.    The landlord notified plaintiff, on March 29, 2021 the that she was not renewing the lease, notifying plaintiff to vacate by the end of the lease term, *(April, 30, 2021)*.

March 29, 2021

Mr. William Whittman
102 Burns Crossing Road
Severn, Md. 21144

Dear William,

Please be informed that this will serve as written notice, per your lease agreement, that your lease will be terminated on April 30, 2021. I've enclosed a copy of our "Tenant Vacating Instructions". Please call us to set up your check out inspection and turn over your keys.

William, if you have any questions regarding the above, please do not hesitate to contact us at 410-975-3024.

Sincerely,

Constance Giddings
Champion Realty Property Management

182.    Plaintiff started to searching for a new place to rent, but wherever plaintiff looked,

with the rental market being incredibly hot, good credit was required.

183.    Plaintiff was forced to look as far as Would bridge and Manassas in Virginal, to

Annapolis and Baltimore in Maryland,  and still no one was willing to accept him, as a tenant

with his name in collection and his credit ruined.

184.    Only a few months earlier, before these Penske defendants placed the amount

they (*Toyota Defendants*) and not plaintiff had refused to pay to *Mercedes Finical*, plaintiff's

credit was very good and he was qualified for a commercial loan, that is harder to obtain.

## Advantage Credit
### Credit Reporting Services

32065 CASTLE COURT SUITE 300, EVERGREEN, CO 80439
Phone:   800-670-7993 * 303-670-7993
Fax:   800-670-8067

Add Product

**MERGED INFILE CREDIT REPORT**

| | | | | |
|---|---|---|---|---|
| FILE # | 5661766   FNMA # | DATE COMPLETED | 9/5/2019 | RQD' BY   TIEN NGUYEN |
| SEND TO | COMMONWEALTH FINANCIAL SVCS. | DATE ORDERED | 9/5/2019 | |
| | CUST. # 6189 | REPOSITORIES | XP/TU/EF | PRPD' BY |
| | 210 E BROAD ST STE 203 | PRICE | | LOAN TYPE |
| | FALLS CHURCH, VA 22046 | REF. # | Sami Gjoka | |

PROPERTY ADDRESS

| APPLICANT | | | | CO-APPLICANT | |
|---|---|---|---|---|---|
| APPLICANT | WHITTMAN, WILLIAM | | | CO-APPLICANT | |
| SOC SEC # | 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 | DOB | 4/30/1962 | SOC SEC # | DOB |
| MARITAL STATUS | UNMARRIED | | | DEPENDENTS | |
| CURRENT ADDRESS | 3800 POWELL LANE, #425, FALLS CHURCH, VA 22041* | | | LENGTH | |
| PREVIOUS ADDRESS | 3326 WOODBURN VILLAGE DR, #T12, ANNANDALE, VA 22003* | | | LENGTH | |

SCORE MODELS

EQUIFAX/FICO CLASSIC V5 FACTA - WILLIAM WHITTMAN - 578198254
SCORE: 688
00010 - DEROGATORY PUBLIC RECORD OR COLLECTION FILED
00018 - NUMBER OF ACCOUNTS WITH DELINQUENCY
00016 - LACK OF RECENT REVOLVING ACCOUNT INFORMATION
00015 - LACK OF RECENT BANK REVOLVING INFORMATION
FA - NUMBER OF INQUIRIES ADVERSELY AFFECTED THE SCORE, BUT NOT SIGNIFICANTLY

185.   Now plaintiff had a huge dent in his credit preventing him from finding even a

cheap place to live.

PROPERTY ADDRESS

| APPLICANT | | | | CO-APPLICANT | |
|---|---|---|---|---|---|
| APPLICANT | WHITTMAN, WILLIAM | | | CO-APPLICANT | |
| SOC SEC # | | DOB | 4/30/1962 | SOC SEC # | DOB |
| MARITAL STATUS | UNMARRIED | | | DEPENDENTS | |

**CURRENT**

| ECOA | WHOSE | CREDITOR | DATE REPORTED | DATE OPENED / DLA | HIGH CREDIT OR LIMIT / ACCT TYPE | BALANCE / TERMS | PAST DUE | MO REV | 30 | 60 | 90+ | STATUS / SOURCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B | B | NISSAN MOTOR ACCEPTANC 102478591550001 | 08/19 | 10/15 08/19 | $14348 AUTO | $0 081 $0 | $0 | 47 | 0 | 0 | 0 | PAID XP/TU/EF |

| | 07/19 | 06/19 | 05/19 | 04/19 | 03/19 | 02/19 | 01/19 | 12/18 | 11/18 | 10/18 | 09/18 | 08/18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Trended | | | | | | | | | | | | |
| Scheduled ($) | 275 | 275 | 275 | - | - | - | - | - | - | - | - | - |
| Actual ($) | 275 | 275 | 275 | - | - | - | - | - | - | - | - | - |
| Balance ($) | 4250 | 4505 | 4760 | - | - | - | - | - | - | - | - | - |

| ECOA | WHOSE | CREDITOR | DATE REPORTED | DATE OPENED / DLA | HIGH CREDIT OR LIMIT / ACCT TYPE | BALANCE / TERMS | PAST DUE | MO REV | 30 | 60 | 90+ | STATUS / SOURCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B | B | SYNCB/LOWE 798192321044 | 05/14 | 06/02 08/04 | $424 REV | $0 $0 | $0 | 99 | 0 | 0 | 0 | PAID EF |
| B | B | WELLS FARGO 442644101802/3089 | 08/14 | 05/12 09/12 | $300 REV | $0 $0 | $0 | 26 | 0 | 0 | 0 | PAID XP/TU/EF |

ACCOUNT CLOSED BY CREDIT GRANTOR, SECURED CREDIT CARD

**DEROGATORY ACCOUNTS**

| ECOA | WHOSE | CREDITOR | DATE REPORTED | DATE OPENED / DLA | HIGH CREDIT OR LIMIT / ACCT TYPE | BALANCE / TERMS | PAST DUE | MO REV | 30 | 60 | 90+ | STATUS / SOURCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B | B | MB FIN SVCS 5001199739001 | 05/21 | 06/19 12/18 | $33394 AUTO | $6708 66 - | $0 | 23 | 1 | 0 | 0 | CUR WAS 30 XP/TU/EF |

Late Dates: 3/20-30
DEBT BEING PAID THROUGH INSURANCE

186.    While plaintiff could not find a place to relocate, the time to vacate was

approaching and he was growing extremely actions, and worry and desperate, not only because

his extremely depressed kids would be thrown out of their home, but also because his credit

would get even worst with an eviction added to his already ruined credit  due the bad faith acts of

these Defendants.

187.    With no one accepting him as a tenet, in desperation to find a place to shelter his

family before being evicted by the court, plaintiff contacted his loan officer Tim, again to see if

they would consider him for a loan with a a much larger down payment than usual.

188.    Tim run plaintiff's credit  and informed plaintiff that even with a larger down

payment they could not help him with the collection and with his credit.

189.    Time for plaintiff to move out run out and the landlord was forced to sue for

eviction under Tenant Holding Over Claim.

**DISTRICT COURT OF MARYLAND FOI**

Located at 7500 Ritchie Highway, Glen Burnie
                            Court Address

| Champion Property Mgt. for Venus Lillybridge | |
| Landlord (Plaintiff) | |
| 815 Ritchie Highway, Suite 211 | |
| Address | |
| Severna Park, Md. 21146 | |
| City, State, Zip | |

'ndel County

City/County

Case No. D-07-CV · 21-01168C

vs.    William Whittman
              Tenant (Defendant)
       102 Burns Crossing Road
                        Address
       Severn, Md. 21144
                   City, State, Zip

**COMPLAINT AND SUMMONS AGAINST TENANT HOLDING OVER**
(Real Property § 8-402)

The complaint of the plaintiff shows:
    The plaintiff is lessor of the premises in or near Severn _____, Maryland, located at 102 Burns
Crossing Road _____ and the defendant occupied the premises as periodic tenant or
unlawfully holds the premises after the expiration of the lease. The rental for the premises is $ 1950.00    per month .
    The plaintiff, desiring to regain possession of the premises, served the defendant on March 29, 2021 _____ ,
with a written notice (copy is attached), to vacate the premises and to deliver possession to the plaintiff on April 30, 2021 .
                                                                                                                    Date
The plaintiff claims restitution of the _____ _____ · _____ · ·

190.    Plaintiff tried to reason with *Mercedes Financial* who had send him to collection,

to fix this, since *Mercedes Financial* was the one who sold him that Gap Insurance, irrelevant

who the GAP Provider was.

191.    On, May 14, 2021 plaintiff called *Mercedes Financial* and spoke with someone by the name of Tjuanna who told plaintiff they could not help him because that balance of $6,708.57, was now held by an outside collection agency.

192.    Plaintiff asked Tjuanna since it is them who sold him the GAP Insurance to him why don't they step in and fix this, by removing the debt in collection or force the provider pay it, since they had acted as the agents of the provider when they sold him the provider's GAP Insurance.

193.    Tjuanna said that the *Mercedes Financial* only financed the car and that it was the dealer, (*Chantilly Benz*) who sold him the GAP.

194,    Plaintiff, then, turned to read GAP Contract to see if he could find any provision in that contract, that world have given the provider any excuse not to pay the claim.

195.    The very first thing plaintiff noticed in that Contract was that that his Insurance Provider was *United Auto Care, Inc,* and not *Toyota Financial.*

**UnitedAuto**Care

| IBEX GUARANTEED AUTO PROTECTION PROGRAM | |
|---|---|
| Debt Cancellation Agreement/Addendum | Debt Cancellation Agreement # **371GMK** |
| | Plan Code |
| | Agreement Effective Date 05/14/2019 |
| | Agreement Purchase Price    630.00 |

(PLEASE PRINT OR TYPE)

**Selling Dealer Information**

| Name | Dealer Code |
|---|---|
| MERCEDES BENZ OF CHANTILLY | |
| Address | |
| 14841 STONECROFT CENTER CT. | |
| City                    State    Zip | Telephone |
| CHANTILLY VA 20151 | (703)956-2000 |

**Customer Information**

Customer Name

WILLIAM WHITTMAN

Co-Buyer/Co-Lessee Name

196.     Trying to figure out how and why he was dealing with *Toyota Financial*, plaintiff learned that *United* did not even exists, as an active entity to offer any kind of insurance services in Virginia.

197.     Plaintiff found out, that the phone number he had been calling; (800-255-8713) was listed in that Contract as the phone number for another inexistent company or branch of company called Administrator and had nothing to do with United

198.     From that moment on, plaintiff was forced to take painstaking affords to figure out who his real Insurance provider was, and why had the Penske Defendants inserted these intentional falsities in his Gap Contract that the Insurance Provider was *United*, and then the *Program Administrator*, and then *Toyota Financial*, while neither one was in fact n authorized GAP Insurance Provider.

199.     *Toyota Financial* that is not mentioned at all in the contract as the provider, hidden by the names of 2 sham companies, United and Program Administrator was the only company, answering that number and claiming to be the legal entity authorized to provide these Gap Services, despite the fact that its identify is not disclosed in the contract.

200.     Further more plaintiff found out this, *Toyota Financial* was yet another intentional falsity another inexistent Sham Company, that does not exists, anywhere, as a legal entity or a registered DBA of any legal entity, authorized to transact any kind of business in Virginia.

201.     Plaintiff then tried to find any information he could about this alleged *Toyota Financial* only to learn that this *Toyota Financial* does not exist anywhere, as a legal entity or the dba of a legal entity, authorized to provide any kind of Insurance Services, anywhere in the country.

202.    There was no way for plaintiff to figure out, based on that Fraudulent GAP
Contract, that these Penske Defendants had drafted by, for all intents and purposes to hide the
true provider, and not expose the providers to liabilities, in their premeditated, heinous and
unlawful acts to deny any potential claim that might arise, in bad faith.

203.    The Contract, however, lists the office address for provider, as a P.O. Box in
*Cedar Rapids, IA*. naming the provider as *Program Administrator*.

204.    Terrified and alarmed, by all this misrepresentation within misrepresentations, in
that Fraudulent GAP Contract that these Penske Defendants had provided to plaintiff, in bad
faith,  plaintiff called on May 14, 2021, the Virginia SCC to find what information the SCCC had
about, *Program Administrator* and/or *Toyota Financial Services*, and/or *United*.

205.    The SCC had no information that any of these companies had any authority to
conduct such business in Virginia and that they had not information at all about *Toyota Financial*

206.    Further more the SCC advised plaintiff to call the Bureau of Insurance at 804-
371-9741, to see if the Bureau of Insurance had any information for these three companies
(*Toyota Financial* or *United*, or the *Program Administrator*) as being authorized to offer any
kind of Insurance in Virginia.

207.    Plaintiff called that day the Bureau of Insurance and spoke with an official (Nate)
who told plaintiff that neither company was registered with them and that plaintiff should call the
OFFICE OF THE ATORNEY GENERAL and speak with *Consumer Protection Section* at 800-
552-9963 which plaintiff did, right away and plaintiff did as directed.



208.    Plaintiff asked the *office of the attorney general*, on May 14, 2021 for help to find

out who amongst the three purported GAP Providers in his Contract was the authorized Gap

Insurance Provider if any of these three enteritis, were in fact the Provider.

209.    The office of the attorney general told plaintiff that the Dealer (*the Penske*

*Defendan*ts) who sold him the Gap Insurance ought to know the exact legal name of the

provider, and that they should provide the providers name to him and explain to him how and

why thee listed on that contract those other names.

210.    Plaintiff called the dealer, (*Chantilly Benz)*, the next day, May 15, 2021 to find

out from them who the GAP PROVIDER was and why had they listed as providers some

falsities.

211.    The dealer's representative told plaintiff to speak to their financial services

*Mercedes Financial* and not them about this and transferred plaintiff' s call to Megan, their

*Financial Services Representative*, who was not able to assist plaintiff with this.

212.   Plaintiff then send an e-mail to her (Megan) and to the *Chantilly Benz General*

*Mismanage Bert O'Neal,* for them to provide him with the legal name and address, of the Real

Gap Provider that they should be able to find on the providers' license, as the office of the

attorney general told plaintiff, if they sold him their Provider's product.



213.   Instead of receiving the information requested, plaintiff got an angry and

harrowing call from Bert O'Neal, demanding to know who Sami Gjoka is, because plaintiff uses

his Albanian name (sami gjoka) as his e-mail address and having no will or desire to explain to

plaintiff why they had lied and defrauded plaintiff in that contract.

214.   Plaintiff told Mr. O'Neal that Sami Gjoka is his Albanian name and that it is not

his business, because it has no relation to his demand, but O'Neal refused to provide this to

plaintiff and hanged up.

215.    Three days later, on May 17, 2021, plaintiff send these Penske Defendants

another follow-up e-mail for them to provide him the legal name of the Provider and to explain

to him while they had misrepresented the providers' name in the contract.



216.    Plaintiff meanwhile was forced to do more painstaking searches to find on web

who his real Gap Insurance Provider might be, and while searching for *Toyota Financial*

*Services Gap Insurance*, the only thing plaintiff was able to find was a company called *Toyota*

*Insurance Management Solutions USA, LLC (TIMS)*.



217.    Plaintiff then tried to search if *Toyota Financial* perhaps, existed in the past as a

legally known insurance provider or if it was still legally authorized to provide such insurance

services in some other US States, but had failed to update whatever documents ion Virginia, that

could have been a honest mistake in their part, but not fraud, and plaintiff found no information

anywhere that this company was or had ever been authorized anywhere to provide any kind of

Insurance services.

218.    All the information plaintiff was able to find about *Toyota Financial*, was that a

company by that name appears to operate in IA.



219.    Based on its own advertisement, on the internet, *Toyota Financial* is an authorized

auto loan provider though plaintiff could not find this company listed in any Va. State

department, as such, either.





220.    The only Toyota Company, authorized to transact any insurance related services,

in Virginia were: *Toyota Motor Insurance Company* (*Toyota Insurance*), and *Toyota Insurance*

*Management Solutions USA, LLC*, (*Toyota Solutions*).

221.    While *Toyota Financial* does not exists as a legal authorized Insurance Provider

it, advertises itself nonetheless as such, on their *Toyota Financial* Services Guaranteed Auto

Protection Online Brochure.





222. Toyota Financial, plaintiff found out had an online Brochure explaining how GAP works

223. Responding to plaintiff's e-mail request, send to *Chantilly Benz & Mercedes Financial*, on Friday, May 21, 2021 at around 1:26 PM, plaintiff received call from a Michigan Area Code telephone number (248) 648-2520.

224. The caller told plaintiff that she was Mercedes Benz Legal Department.

225. The caller told plaintiff, that they had not denied his claim but he (plaintiff) had not filed the Claim.

226. This struck plaintiff, as an arrogant and dishonest denial of the facts, because, plaintiff had filed the Gap Claim since Jan 6, 2020.

227. But, what shocked and surprised plaintiff even more was the fact that this individual claiming to be from Mercedes Benz Legal Department was speaking on behalf of the Toyota Financial, stating that plaintiff had not filed the claim. and that's why they (THEY) had not paid it, yet.

228.    Further more this caller from Mercedes-Benz Legal Department, as she said she is, distorted plaintiff's request, to know the *legal name of the Gap Provider,* telling plaintiff that the they would provide him with the address of "United" who is not the provider and she knew this, more than anyone being even from the legal department of these Penske Defendants

229.    Plaintiff felt insulted and taken for a fool because plaintiff had not asked them for the "United" address" but only to know why had they listed *,United* in the Contract, as the Provider, knowing it to be false.

230.    Plaintiff interrupted her, by telling her; *"please stop playing this dirty game with me"* and told her: *"You sold me this Gap Insurance and you have falsely expressed, in the gap contract that United is the Insurance Provider while United is not"* and

231.    Plaintiff, told her*: "You are lying and denying the fact that I have filed the Gap Claim, since January 6, 2020".*

232.    Plaintiff told her that *Toyota Financial* not UNITED had denied his claim and that no claim can be denied unless, first, it has been filed and demanded to know why she was claiming we have not denied your claim, when they are not the Provider.

233.    Plaintiff told her again that: *"I have not asked you for the address of "United" but for the legal name of Real GAP Provider which does not seem to be Toyota Financial either."*

234.    Plaintiff told her, that, to him, *the dealers, the financing institution, and the insurance provider*, and even this *legal department*, were all one and the same, involved in unlawful acts to cheat, deceive, eluding and defrauding to deny the claim in bad faith and to hide the real Provider so plaintiff ahs no clue who to sue for his denied claim in bad faith.

235.    Plaintiff told her, that they were liable to plaintiff, now, not only for the unpaid balance of the car loan, that should have been paid since more than a year ago, but for having

harmed and damaged him with his ruined credit much more severely, that they would have imagined.

236.   Plaintiff demanded from her that day to make sure she understood what plaintiff was saying, before they hanged up, because, plaintiff told her: "*I am a foreign born American citizen and some time even my own kids do not understand what I am saying in English*".

237.   The caller assured plaintiff that she understood him well and she insisted again to tell plaintiff the address for United that plaintiff had no need for and had not asked for, at which point plaintiff told her to stop and to understand that he had no need for the address of United and that he had not asked for it, but rather he wanted to know from them who his real provider is and why they had misrepresented that it is United.

238.   The caller told plaintiff that she could not provide that information to him right away but that their legal department would provide that information to him, by Monday, May 24 and yet. they did not.

239.   On May 25 plaintiff called the same number (248) 648-2520 but got no answer.

234.   Plaintiff left a messages, with them, but did not get any response.

240.   On Tuesday, May 26, 2021, plaintiff called back this Legal Department to ask why they had failed, to make good on their promise, but again no one answered except a female recorded voice message, stating word per word "*I am not available to take your call, please leave a message*".

241.   Plaintiff then decided to search that phone number on internet to see if that number belonged to Mercedes Benz Legal Department.

242.    That number, plaintiff found out to belong to an individual by the name of

*Deirdre Thomas* who appeared to work as an attorney for Toyota *Defendant*s and not *Mercedes-Benz*, as she had represented to plaintiff.

243.    Searching the name of this individual, *Deirdre Thomas,* plaintiff came across, a

letter on web, written by this individual, in behalf of Toyota and not in behalf of Mercedes-Benz,

as she told plaintiff she works for.

244.    On May 26, plaintiff called Mercedes Benz Legal Department at (248) 648-2520,

again to talk to her but again no one answered.



245.    Then, at the end of the business day, around 4:30 PM that day, plaintiff wrote

again to the Penske defendants, at the *Chantilly Benz Location* in, yet, another attempt to get the

information he was looking for.

246.    Plaintiff asked the Penske Defendants, again to provide him with the information

he needed.

 **Sami Gjoka** <samigjoka@yahoo.com>
To: boneal@penskeautomotive.com,
mteymorian@penskeautomotive.com
 Wed, May 26 at 4:28 PM

Another Attempt

Dear Mercedes Benz officials
Last week on  Friday 21 your Mercedes benz legal department called me and assured me that by Monday I will
have from you the legal entity name and the legaly known office address for the insurance provider and the
explanation why you have listed on thus gap contract as my insurance provider a company that has nothing to do
with honring thus gap insurance
Yet you and or your Mercedes legal department has not send such information neither on Monday nor in Tuesday
and I do not have anything at all even at this point
I have called that number where I was called on your behalf and a female  voice sounding more like a street thug
than a legal department profesional only says only " im not available to take ur call and please leave a message
and mention nothing of being a legal department of any one and never calls back
If you have hired an attorney  to deal with thus matter or you really have a legal depahandling it please respond by
telling me who the legal department contact information and designated attorney is or please stop this hinious acts
and provide me as you should by the responsibilities of the duty of care the information I keep asking you to
provide

Sent from Yahoo Mail on Android

447.    On May 27 Mr. O'Neal replied to plaintiff and provided plaintiff with the legal

name of the GAP Provider, listing the Gap Providers as three Legal entities, and all Toyota

Companies, and all registered with the VA. SCC, as the e-mail expressly implies but none being

*Toyota Financial* as the plaintiff had been, intentionally and deliberately, mislead to believe, by

them till that day.



248.    On Friday, May 28, someone claiming to be from *Toyota Financial*, called plaintiff about this claim.

249.    Plaintiff asked for her name and she said her name is Michelle, refusing to tell her full name, as her company policy.

250.    Plaintiff demanded to know her name, telling her that he did not see anything wrong for her to provide him the full name.

251.    Michelle said she will provide only the first initial of her the last name.

252.    Plaintiff was very unhappy with his hesitation and said to her, that this is not an escort service or a strip club for her to give him her stage name, explaining to her that he needed her name to know exactly who he spoke to, if he had to refer to this call in the future, since they kept changing the story at every single call, in bad faith, as to why they were denying his claim.

253.    The caller then told plaintiff that her name was Michelle Knospse.

249.    Plaintiff then asked her: "*You said you are from Toyota Financial Services*" and she said: "Correct".

254.    Plaintiff asked her; if she was aware that *Toyota Financial Services* does not exist, as legal entity and asked her if she was sure that her company's legal name was Toyota Financial Services.

255.    She said: "Yes".

256.    Plaintiff asked her if her pay check lists her company as Toyota Financial Services, explaining to her, that he had done his search and had not found anywhere that there is a legal entity called Toyota Financial Services that is authorized to engage in insurance related services, or that could possibly pay her, her check.

257.    Michelle Knospse then said that her company is ***Toyota Motor Company***.

258.    That was the very first time, in almost 2 years dealing with this company that someone was forced to admit that they had been lying all along about who they really were, to make it impassible for plaintiff to seek justice against their harmful and unlawful acts of bad faith.

259.    Plaintiff then asked Michelle why she had called him

260.    Michelle said that she had called To help him with a problem he was having with the claim.

261.    Plaintiff asked her how did she know he was having a problems with the claim.

262.    She said: "*Because Mercedes Benz has told us*".

263.    Plaintiff said to her: "*Are you telling me that the same Mercedes Benz who has allegedly refused to provide you with may payoff information for you to pay the claim, is having no problem to providing you with the content of my e-mail?*'

264.    She said; "*Yes*".

265.    Plaintiff asked her why GAP Contract he has, lists United Autocare Inc, as his Gap Insurance Provider, while she said her company is *Toyota Motor Company.*

266.    Michele said; "*Because United and Toyota is the same company*"

267.    Plaintiff then asked her; "*And how can You, & United & Toyota Financial, & Toyota Motor Company help me today*?"

268.    She said: "*You need to file the claim for us to be able to help you and you have not file it yet and that's the reason we have not paid your claim* ".

269.    Plaintiff told her: "*Can you please then explain to me how have you denied my claim is my claim has not been filed*?"

270.    Michele then said: *"We have denied your claim because you have reported that your car was stolen or lost".*

271.    Plaintiff than said to her "*Let me get this straight. You are telling me that when I called to report to you that my car was stolen or lost, that I might have perhaps mistaken you for the police department, asking you to find my car and not to pay my claim?*"

272.    Michele then changed the story again, telling plaintiff that the claim was filed but the needed additional documents were not provided to them for them to pay the claim.

273.    Plaintiff then told Michele that he was tired of their games, changing the story every second why they had not paid his claim, and told her that he needed them to write to him, via e-mail why they have denied his claim, a claim that allegedly he never filed, and yet a claim

Page 55 of **69**

that was in fact filed but denied because some requested documents were not received and to specify exactly what documents they needed from him in order for them to pay the claim.

274.     Ms. Knospse said that she will mail that him but not e-mail because they were not allowed to communicate via e-mail.

275.     Plaintiff said to her that, that he did not understand why they, in this day and age when companies prefer e-mail, communication because it is a faster and more convenient and easy to trace they did not.

276.     Michele Knospse said she would do an expectation this time and e-mail him by Monday, May 31, that turned out again to be another lie.

277.     Monday, May 31, was a holiday and plaintiff did not mind not receiving anything from them, believing he would get the e-mail the following day, but they did never e-mail anything to plaintiff.

278.     On, June 2, 2021, plaintiff called *"Toyota Defendants"* to ask if they had perhaps misspelled his e-mail address since he had not received anything from them yet.

279.     The representative who answered the phone, introduced himself as Chat, refusing to provide his full name, as company policy.

280.     Chat told plaintiff that they had an old address for plaintiff, on file and that this is the reason why he had not gotten their **how to apply for the claim** package.

281.     Plaintiff explained to Chat that his claim has been already fled since almost 2 years ago and that he was supposed to receive from them something via email.

282.     Chat, told plaintiff that he was pulling up plaintiff's claim *(a claim that shouldn't exist if not filed)*.

283.    Chat, then said to plaintiff that he was reading some notes in the plaintiff's claim
and then he said to plaintiff that they had send him, on May 18 a GAP Claim Kid.

284.    Plaintiff asked what that is and chat said it is an instruction how to file a gap
claim.

285.    This was another Mary-Go-Around, in bad faith, for plaintiff  and Plaintiff
demanded to speak to Michele but Chat said they don't have any Michele and that he does not
see any notes, that a person named Michelle, has ever spoken to plaintiff about this claim.

286.    Chat said that if someone named Michele spoke to you, there will be notes
evidencing that.

287.    Chat said that the only note he sees, regarding his claim is from June 10 of the last
year, when plaintiff spoke with Kevin, and it looks, from notes, Chat said, that you were
disputing the denial of the claim, at that time.

288.    Plaintiff insisted that he had spoken only a few days earlier with someone who
claimed to be Michelle Knospse.

289.    Chat then said that the last communication noted in his claim was with Lisa not
Michele and that, the communication between him and Lisa allegedly took place on May 18
when Lisa supposedly reopened the denied claim, a claim that also, according to them, was never
filed.

290.    Plaintiff insisted he has not spoken to any Lisa and that he was asking for
Michelle Knospse who had called him last week and promised to e-mail him some documents.

291.    Chat said: "*If you did speak with a Michelle and there is no evidence here to
prove this,  there is nothing I can do for your regarding this*" and

292.    Chat added, that" "*All I see here is that Lisa has reopened your claim 2 weeks ago*".

293.    Plaintiff asked Chat to help him find out who Michelle Knospse is.

294.    Chat said, that there is no Michele working there.

295.    Plaintiff said to Chat. "*Are you telling me that I have been lied gain by your company that day*?"

296.    Chat then said; "*I know a Michelle but she has not called you and she has not made any notes about a phone conversation to you*".

297.    Plaintiff demanded to speak to that Michelle.

298.    Chat said this is not possible because she works remotely, whatever that meant, that still does not make any sense to plaintiff because Chat and plaintiff were not talking in person either.

299.    On June, 2, 2021 *Toyota Defendants* had written to plaintiff , directing plaintiff to start the claim by contacting the financing institution (*Mercedes Financial*), something plaintiff had already done almost since 2 years ago and that they knew it because they contacted plaintiff, on Friday May 28, to tell plaintiff that the Mercedes Benz had informed them of the Total Loss.

300.    Toyota Defendants were again trying their bad faith tactics to delay and deny asking plaintiff to start all over again do the same thing done already till plaintiff decides to give up or the time to honor the claim expires.

**⊕ TOYOTA**
FINANCIAL SERVICES
P.O. Box 9550
Cedar Rapids, IA 52409-9550

Agreement Number: 7725261
Vehicle Information: 2016 MERCEDES-B
C
Vehicle Identification Number: WDDWF4KB3GR143308

June 02, 2021

WILLIAM WHITTMAN
100 N WASHINGTON ST SUITE 200
FALLS CHURCH VA,22046

Dear WILLIAM WHITTMAN:

We are sorry to hear about the total loss of your 2016 MERCEDES-B C. Fortunately, you purchased our **Guaranteed Auto Protection (GAP)** product. We will work hard to handle your claim as quickly as possible. You can help by following our step-by-step instructions.

In order to review your GAP claim, we need some information and certain documents. Please ensure all correspondence includes your agreement number as noted above. It is important that we receive complete and accurate information and documents in order to process your claim. We promise to make a decision on your claim within (30) thirty days of receiving **all** of the required information and documentation.

**IT IS YOUR RESPONSIBILITY TO ENSURE THE DOCUMENTS REQUIRED BY YOUR GAP AGREEMENT ARE PROVIDED TO US IN ORDER TO PROCESS YOUR CLAIM.**

For best results, please follow these steps:

1. Sign the attached form and fax or mail it to the finance company. This gives them permission to share your account information with us.
2. Immediately contact any companies providing additional coverage (such as Vehicle Service Agreements, Excess Wear & Use Protection Plans, Prepaid Maintenance Plans, Credit/Life Products, etc.) and request cancellation of these products or if you prefer, contact the selling dealership for assistance.
3. Once your insurance company has made payment to your financial institution, follow up with your finance company to make sure they sent us the required documents.

301.  On July 9, 2021, while plaintiff was searching for a rental place,  from as far as

Would bridge and Manassas in VA, to Annapolis and Baltimore in MD, plaintiff received a

disturbing and harassing phone call from *Northstar Location Services, LLC*.

302.  Northstar was trying to collect the debt they had for the amount owed to the

Penske Defendants, by plaintiff that ought to have been paid in god faith  *Toyota Defendants*.

303.    Northstar was now calling plaintiff, nonstop, and it terrified plaintiff to answer the phone being with his clients or employees something plaintiff did not have to go through, had these defendants not acted in bad faith.

304.    A Northstar representative, told plaintiff, in one of their calls that, even if plaintiff disputed that debt in collection, it still was better fro plaintiff to pay it than fight for it and spend more to resolve than just pay it and let it go.

304.    Northstar emailed plaintiff, the information about this dept, on Jul 9, 2021.

305.    On July 11, 2021, devastated bu the fact that the Eviction Hearing was approaching and he had not been able to find a place to relocate, because no one wanted to accept a tenant in collection and with bad credit, plaintiff called, out of desperation, a different loan officer, (Shap Bashar), plaintiff had worked before to see if Shap could find him a loan, that Tim could not, with a bigger down payment, and with someone co signing for him.

305.    Plaintiff told Shap that his credit was severely damaged by a judgment of about 7-thousand dollars that he did not owe but was in collection against him, nonetheless.

306.    Shap informed plaintiff that the co-borrower does not offset the bad credit and that *in* terms of mortgage qualifying, the only reason to get a co-signer is for income purposes.

307.    Shap wrote to plaintiff that: "Good credit never offsets bad credit and FNMA/FHLMC who buys most of the loans out there, will likely have a problem just like Tim had mentioned.

308.    Plaintiff could not rent and plaintiff could not buy and plaintiff was pressed for time to find a place, for his kids, before *the landlord/tenant curt* would throw his kids on the street under tenant holding over causes of actions, all because of these defendants acts of Bad Faith.



SHAP@wellsfargo.com <shap@wellsfargo.com>
To: samigjoka@yahoo.com

Sun, Jul 11 at 2:07 PM

Hi Sami
I'm really sorry to hear all this. I have a friend that sues banks for a living (mostly for APR and loan term violations)
I wonder if he'd be interested in helping you. Let me know if you'd like his information.

In terms of mortgage qualifying, the only reason to get a co-signer is for income purposes. Good credit never offsets bad credit and
FNMA/FHLMC who buys most of the loans out there, will likely have a problem just like Tim mentioned.

There are obviously some sub-prime lenders but you'll pay extra for them. I can give you a name if you like.

I hope this works out. Let me know if I can do anything.

Thanks
Shap

Shap Bashar
Private Mortgage Banker
New Construction/RELO/Military Lending Specialist
Presidents Club
NMLS ID: 481189
Wells Fargo Home Mortgage | 7475 WISCONSIN AVE, 3RD FLOOR | BETHESDA, MD 20814
MAC R1006-020
Direct 703.757.2977
Fax 866.969.3870
Shap.Bashar@WellsFargo.com
www.shapbashar.com

Mortgage Team:

309.    As of July 19, 2021 the *Gap Provider* had still had not, decided to pay his claim,

though now again they had changed the story, claiming that plaintiff had, in fact, filed the claim

since Jan. 6, 2020.



310.    On August 18, the noose in the plaintiff's neck was getting tighter for him to

relocate.

311.    Plaintiff kept offering to pay the entire annual rent  upfront and in advance just to

get a place to shelter his family and still no one was accepting him, because no one had a need, in

a hot rental real estate market, for tenants with bad credit

312.    At the end of July, plaintiff found a town home, in Howard County,

Plaintiff contacted the listing agent, via e-mail and offered to pay the entire annual rent upfront

and in advance.

313.    Being afraid, desperate and pressed for time, plaintiff took snapshot of the email

text and texted to the agent's cell number



314.    The agent informed plaintiff that the landlord did not like the fact that the

plaintiff's credit score was so law despite the fact that plaintiff offered to pay the entire rent

upfront and in advance. and they demanded to know why his credit was so low.

315.    Plaintiff explained in detail, to them, how and why his credit was ruined.



316. Plaintiff, was now grilled and interrogated, going though embarrassing and

harassing experiences he did not have to go through, if not for these defendants bad faith.

317. The listing agent did not respond to plaintiff's explanation.

On August 2021 plaintiff sow on the MLS that an old friend of his (Frank) who plaintiff used to

work with, years ago in the same office at the Fairfax Realty, had listed a condo for rent in

Reston VA.

318. Plaintiff thought that Frank perhaps could, be able to convince the landlord to

accept plaintiff as his tenant despite being in collection and having a ruined credit now.

319. Frank said to plaintiff if it was my own home I would rent it to you in a heartbeat

but I can't possibly tell my client to ignore this.

320. Plaintiff then found another condo, on a ground level, in Falls Church, VA that

had no refrigerator, no stove and had a lot of problems with lightening and fixtures, that plaintiff

thought no one would apply for and plaintiff out of desperation, was willing to get, still offering

to pay the entire annual rent upfront that no one in his right mind would have, till the place was

first at least made livable.



321.    The address for this condo was; *2902 Kings Chapel Rd #2, Falls Church, VA*

*22042.*

322.    Plaintiff had no options left but get this unit, as is and he contacted the listing

agent CHUNHUA YANG about this.

323.    The agent sent plaintiff the rental application package via e-mail, and plaintiff

rushed to his office to get the application package ready.



324. Despite the fact that this condo was in distressed shape, and not habitable in the present condition, and despite the fact that plaintiff offered to pay the entire annual rent upfront and in advance, the agent, came back and informed plaintiff that they were looking for someone with good credit.

325. Plaintiff was forced for this reason to explain to the listing agent why his credit was damaged and why they should accept him.

326. Plaintiff explained in that e-mail to the listing agent why his credit was bad and why they should rent to plaintiff, stating word per word: "*My credit score was severely damaged because of a judgment (car Insurance, dispute we have) and don't let this scare you because you have me ready to pay you the entire year upfront.*



**Sami Gjoka** <samigjoka@yahoo.com>     Sat, Aug 21 at 3:03 PM

To: chunhua yang

Dear Chunhua Yang

Please be aware that my credit score was severely damaged because of a judgment (car Insurance, dispute we have) and don't elt this scare you because you have me ready to pay you the entire year upfront.

I can't fix it because I cannot pay this judgment, because the insurance is suppose to pay it and if I pay they will not give a damn.

This has happened because a couple of years ago I bought a Mercedes from a dealer in Chantilly

at that time the dealer offered me an additional insurance called GAP and provided by Toyota Financial.

That Gap insurance was supposed to cover , in case of accident when the car is totaled, the Gap (difference) between how much you still owe and how much the car is worth when it was totaled.

My car was totaled a year later because someone stole and crushed it - the Gap Insurance refused to pay trying to delay and deny and now they want to pay it because I am seeking legal help but they have already ruined my credit and I want them to pay for it

This though should not make your client worry because in my part I am

327.    Plaintiff included in that e mail all the needed documents for the lsiting agent to

qualify him and notified the agent to: "*Please find Attached the: 1) Rental Application, 2) Up to*

*date Income for 2021, 3) My Drv. License, 4) My Biz (Real estate) Licences, 5) My Biz. Inf (Biz*

*Card), 6) The Entire Annual Rent paid to Jing Zhu $25200.00, 7) The Security Deposit of*

*$2100.00 paid to Jing Zhu and 8) The first rent of $2100.00 Paid to Jing Zhu!*"

To make sure plaintiff would get this place he told them that he would take the unit as it is with

no working appliance, and that he would buy the appliances himself, from his pocket and not

even take them with him at the end of the lease and only if he stayed for a second year he would

let them deduct the expenses of buying them from the second annual rent as seen incorporated here word per word: *"The kitchen is missing the stove and that is landlords responsibility - I will not have a use of the refrigerator to buy and take with me when i leave, but if the landlord wants I can buy it and deduct from the next total annual rent"*.

328.    They still refused to rent to plaintiff because to them good credit was the most.

329.    Plaintiff was not able to find a place to relocate before the Court, ordered plaintiff out, and threatened him with eviction in 10 days, if he did not move before that time.

330.    Plaintiff has appealed the eviction, though he no longer lives there, only if the court will be able to erase this record from his personal information, based on the fact, that this is due to other bad actors acts of bad faith, but there is no much hope that this will happen.

331.    Therefore plaintiff has brought this civil action for relief after exhausting all possible means to resolve this outside the court.

332.    Just before filing this Claim, plaintiff contacted Toyota Defendants again and spoke, on Monday, Dec 6, 2021 with Kyle, person plaintiff had spoken on Feb of 2020who told plaintiff after plaintiff provided him with the payoff information, and informed him that the Trexes had paid its part to Mercedes Financial, that they were going to pay their part of the claim within pay their part within 5 business days,

333.    Kyle told plaintiff on Dec 6, 2021, that his claim is denied, because they have not received the needed documents to approve the claim.

334.    When plaintiff asked Kyle what documents do you need, Kyle said: "I don't know but it says here we need some documents

335.    Plaintiff has exhausted all the possible means to resolve this matter without involving the court, plaintiff has provided these defendants timely and promptly whatever they

needed as soon as they needed something concrete and specified from, plaintiff for them to pay

the claim, plaintiff has been harmed and inured with loses that exceed 300-320 consequential

(actual damages alone only for the rental house he lost that could be his and could have profited

him that amount, without all harms and damages as stated above


**THERFORE** the relief for Actual, & Consequential & Punitive Damages and for Court

Costs and Legal Fees if legal representation will be hired at any stage of this prosecution of this

claim are just and proper and plaintiff prays for the sought relief.


William Whitman

202-391-5582